IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 23, 2022

**STATE OF TENNESSEE v. RIKEALYN L. FAIN**

**Appeal from the Criminal Court for Knox County**
**No. 118361    G. Scott Green, Judge**

_____

**No. E2022-00026-CCA-R3-CD**

_____

The Defendant, Rikealyn L. Fain, was convicted by a Knox County Criminal Court jury of attempted second degree murder, a Class B felony, and employing a firearm during the commission of a dangerous felony, a Class C felony, for which he is serving an effective sixteen-year sentence. *See* T.C.A. §§ 39-13-210 (2018) (second degree murder), 39-12-101 (2018) (criminal attempt), 39-17-1324(b)(1) (employing a firearm during the commission of a dangerous felony) (Supp. 2020) (subsequently amended). On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

J. Liddell Kirk (on appeal), and Michael Graves (at trial), Knoxville, Tennessee, for the Appellant, Rikealyn L. Fain.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to the November 9, 2020 shooting of Marquis Ellis. In the months before the shooting, the Defendant and the victim had a disagreement about the victim's having posted a photograph on social media which depicted the Defendant's cousin lying in a casket after the cousin was killed in a car wreck.

At the trial, the victim testified that the Defendant had approached him at school in February 2020 and had wanted to fight. The victim declined to fight at school. About a

month later, the victim and a friend saw the Defendant and the Defendant's brother or friend at a store. The Defendant wanted to fight the victim's friend, and the two had a fistfight. The victim and the person with the Defendant also had a fistfight. No one was injured in the brief fights.

The Defendant testified that before the fistfighting incident, he had asked the victim to delete the photograph of the Defendant's cousin which the victim had posted on social media and that the victim declined. The Defendant said that other individuals had asked the victim to delete the photograph and had yelled and cursed at the victim, but that the victim had stated he had been friends with the deceased cousin and would not delete the photograph. The Defendant said that "someone" called him "the B word" on the day of the fistfight and that he had punched the victim's friend in response before they engaged in a mutual fight.

Both the victim and the Defendant thought the disagreement was settled after the fight. They had no other interaction until November 9, 2020, at which time they encountered one another in a neighborhood. The Defendant was waiting outside for his uncle to come home, and the victim and a juvenile, D.M., were outside talking to others. The Defendant stated he overheard the victim say he was going to leave because the "ops" were there, referring to someone who stood in opposition to him. The Defendant said he realized the victim had been referring to him as an "op." According to the victim and D.M., the Defendant said something to the victim as the Defendant passed, and the Defendant and the victim turned to face each other. The victim said that he told the Defendant that they were not "cool" due to their past, that the victim and D.M. were not going to talk to the Defendant, and that the victim had heard the Defendant was a "snitch." The victim testified that after these words were exchanged, the Defendant pulled a handgun from his hoodie pocket and showed it to them. The victim said the Defendant stated, "[O]h, that's how it is," as the Defendant produced the gun from the pocket of his hoodie. The victim said that he offered to fight the Defendant after the Defendant flashed the gun and that he told the Defendant, "[I]t don't got to go to gunfire." The victim said the Defendant stated, "F that," took out the gun, and shot the victim in the stomach.

Regarding the events leading up to the shooting, D.M. said the Defendant clutched something in his pocket and said, "[D]o you want to play with me?" D.M. stated that the victim had said he did not want anything to do with what the Defendant had "going on" and that the Defendant pulled out the gun and shot the victim before running away. D.M. said he had seen the Defendant's hand on the gun in the Defendant's pocket as the Defendant spoke but that the Defendant only took out the gun one time.

The Defendant acknowledged that he had flashed a gun at the victim and D.M. The Defendant said he had pointed it at the ground. The Defendant stated that he did not produce the gun until after the victim had said they could fight and that he had not produced

-2-

and fired the gun until the victim twice stated they could fight and after the victim and D.M. stepped toward him with their fists clenched at their sides. The Defendant said he had thought the victim and D.M. were going to attack him. The Defendant explained that he had leukemia, had been weak from chemotherapy, and a fight might prove fatal if he were struck in the chest, where he had a metal plate with a tube implanted for his chemotherapy treatments. The Defendant acknowledged shooting the victim in the stomach but said he had meant to shoot at the victim's feet. The Defendant said that he had been strong enough to fight in the prior incident at the market because he had been taking steroids at the time but that he was no longer taking steroids and was not strong enough to fight on November 9, 2020.

The victim denied that he and D.M. had walked toward the Defendant immediately before the shooting. The victim said that he had known the Defendant had leukemia and was undergoing chemotherapy but that the Defendant had not said he had brittle bones and was too weak to fight on November 9.

The victim suffered a gunshot wound to the upper abdomen, underwent surgery, and was hospitalized for a week. He was in a wheelchair for three weeks to one month. An emergency room nurse testified that the victim could have died from blood loss if he had not been treated and that he had been taken to surgery within five minutes.

An expert in forensic firearm and toolmark examination testified that a gun recovered when the Defendant was taken into custody had a heavy, inconsistent trigger pull and that the heavy trigger pull precluded the possibility of accidental firing.

After receiving the evidence, the jury acquitted the Defendant of attempted first degree murder and convicted him of the lesser-included offense of attempted second degree murder. The jury also found the Defendant guilty of employing a firearm during the commission of a dangerous felony. At a sentencing hearing, the trial court imposed consecutive sentences of ten years for the attempted second degree murder conviction and six years for the firearm conviction. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the evidence does not support a finding that he knowingly attempted to kill the victim and that, instead, the evidence shows that he acted to escape from an imminent assault by the victim and D.M. The State counters that the evidence is sufficient to show that the Defendant did not act in self-defense when he shot the victim. We conclude that the evidence is sufficient to support the convictions.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A. Attempted Second Degree Murder

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Second degree murder is defined as a knowing killing of another. *Id.* § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2018). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. Intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

At the time of the offense, the self-defense statute provided:

> (b)(1) Notwithstanding § 39-17-1322 [relative to the use of a handgun in self-defense or defense of another], a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to

retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

      (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

      (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(1), (2)(A)-(C) (Supp. 2020) (subsequently amended). Once a defendant has raised sufficient facts to support a finding he acted in defense of self, "The state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

Viewed in the light most favorable to the State, the evidence shows that words were exchanged between the victim and the Defendant, that the Defendant flashed a gun, and that the victim tried to deescalate the situation by offering to fight the Defendant, stating "[I]t don't got to go to gunfire." The Defendant responded by stating, "F that," taking out the gun a second time, and shooting the victim. The Defendant admitted he shot the victim, though claiming he meant to fire at the victim's feet. The victim denied that he and D.M. had been advancing on the Defendant when the Defendant took out the gun the second time. The evidence showed that the handgun the Defendant used required heavy trigger pull, which eliminated the possibility of accidental firing. The Defendant testified that he was in a fragile medical condition due to his leukemia and chemotherapy treatment and that he feared the victim and D.M. were going to assault or kill him. The victim and D.M. testified that the Defendant was the aggressor, thereby negating the Defendant's self-defense claim. The jury assessed the Defendant's credibility regarding the self-defense claim and found, by its verdict, that the Defendant had not acted in self-defense.

From the evidence, a rational jury could conclude beyond a reasonable doubt that the Defendant was aware that his conduct – shooting the handgun at the victim – was reasonably certain to cause a result – the victim's death. Fortuitously, the victim received life-saving medical care for what would have otherwise been a fatal injury. The evidence is sufficient to support the attempted second degree murder conviction.

## B. Firearm Offense

The Defendant argues that the evidence is insufficient to support his convictions, but he has not specifically addressed the conviction for employing a firearm in the

commission of a dangerous felony. The State argues that the evidence is sufficient to support the firearm offense conviction.

As relevant here, "It is an offense to employ a firearm . . . during the . . . [c]ommission of a dangerous felony[.]" T.C.A. § 39-17-1324(b)(1). Attempted second degree murder is a "dangerous felony." *Id.* at (i)(1)(B).

Viewed in the light most favorable to the State, the evidence shows that the Defendant used a firearm in the commission of a dangerous felony, attempted second degree murder. The evidence is sufficient to support the conviction.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE